**UNITED STATES BANKRUPTCY COURT**          <u>**NOT FOR PUBLICATION**</u>

**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------x

In re:                                                                     Chapter 11

FOOD MANAGEMENT GROUP, LLC,          Case No. 04-22880 (ASH)
KMA I, INC.,                                                    04-22890 (ASH)
KMA II, INC.,                                                   04-22891 (ASH)
KMA III, INC.,                                                  04-22892 (ASH)
BRONX DONUT BAKERY, INC.,                           04-20312 (ASH)

                                                                         (Jointly Administered)

                                              Debtors.

-----------------------------------------------------------------------x

FOOD MANAGEMENT GROUP, LLC,
KMA I, INC.,
KMA II, INC.,
KMA III, INC.,
BRONX DONUT BAKERY, INC.,                           Adversary Proceeding

                                              Plaintiffs,         Case No. 06-08470A

        - against -

RICHARD PU,

                                              Defendant.

-----------------------------------------------------------------------x

**A P P E A R A N C E S :**

**JANICE B. GRUBIN**
**Chapter 11 Trustee**
**140 Broadway, 39th Floor**
**New York, NY 10005**

**DRINKER BIDDLE & REATH LLP**
**Attorneys for Plaintiff, Janice B. Grubin as Chapter 11 Trustee**
**By:  John D'Attomo, Esq.**
**191 North Wacker Drive, Suite 3700**
**Chicago, IL 60606**

**RICHARD PU**
**120 East 90th Street, 10C**
**New York, NY 10018**

**ADLAI S. HARDIN, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

### DECISION GRANTING IN PART AND DENYING IN PART THE CHAPTER 11 TRUSTEE'S OBJECTION TO THE CLAIMS OF RICHARD PU

Richard Pu ("Pu") is one of the debtors' former attorneys and has filed a $489,448.81

proof of claim on account of legal services rendered to the debtors and/or other entities. Pu's

proof of claim is based on a number of engagements billed under thirteen separate billing cate-

gories. The Chapter 11 Trustee (the "Trustee") has objected to Pu's proof of claim on a variety

of grounds and seeks an order disallowing and expunging the claim in its entirety through this

adversary proceeding.[1] For the reasons set forth below, the Trustee's objection will be sustained

in part and overruled in part. This adversary proceeding was tried to the Court without a jury

and this decision sets forth the Court's findings of fact and conclusions of law in accordance with

Bankruptcy Rule 7052.

### Jurisdiction

The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(b) and

157(a) and the standing order of referral to bankruptcy judges signed by Acting Chief Judge

Robert J. Ward on July 10, 1984. The adversary proceeding now before the Court is a core

proceeding under 28 U.S.C. § 157(b)(2).

---

[1] The Trustee originally sought to expunge Pu's claim under 11 U.S.C. § 502(d) in connection with an adversary proceeding brought against Pu to recover certain transfers as fraudulent transfers and/or preferences. The Trustee later filed an objection to Pu's claim in the main bankruptcy case on the additional grounds addressed herein. The two actions seeking to disallow and expunge Pu's proof of claim were consolidated in this adversary proceeding under Bankruptcy Rule 7042. Following the trial, the Trustee withdrew her fraudulent transfer and preference claims and accordingly withdrew her claim under Section 502(d). What remains in this adversary proceeding is the Trustee's claim objection that was originally brought in the main bankruptcy case.

## Background Facts

The debtors are each companies that were owned and operated by Anastasios Gianopoulos ("Tom"). The debtors (or the "Tom Companies") owned and operated a number of Dunkin' Donuts franchises in the Westchester area. Debtors KMA I, Inc., KMA II, Inc., KMA III, Inc. and Bronx Donut Bakery, Inc. were formed on November 19, 2002 as part of an October 18, 2002 settlement (the "Dunkin' Donuts Settlement Agreement") between Dunkin' Donuts Incorporated, Baskin-Robbins USA Co., Baskin-Robbins Incorporated and Third Dunkin' Donuts Realty, Inc. (collectively "Dunkin' Donuts") and Tom, Tom's brother Constantine Gianopoulos ("Gus"), and numerous companies owned and controlled by one or both of the Gianopoulos brothers, some of which (those companies that have been referred to in these proceedings as the "Gus Companies") operated the donut shops and bakery that were later transferred to the Tom Companies. The Dunkin' Donuts Settlement Agreement resolved three separate lawsuits pending in federal District Court between the parties to the Agreement. It provided, in relevant summary, that the Dunkin' Donuts franchise agreements that were held by the settling Gianopoulos companies would be transferred to new corporate entities to be owned by Tom and/or Gus which were to operate the franchises (and the bakery that serviced them). Pursuant to the Dunkin' Donuts Settlement Agreement, some but not all of the franchise agreements held by the Gianopoulos companies were transferred to debtors KMA I, Inc., KMA II, Inc., KMA III, Inc. and Bronx Donut Bakery, Inc. However, the other assets of the Gianopoulos companies (including several Dunkin' Donuts franchises) were not transferred to the Tom Companies which became the debtors.

3

Sometime in 2003 Questech Financial LLC ("Questech") brought one or more actions against the Gus Companies and other companies owned or controlled by one or both of the Gianopoulos brothers (the "Questech defendants")[2] in New York State court (the "Questech state court litigation") seeking to foreclose upon substantially all of the assets of those companies based on a default under seventeen notes and security agreements that encumbered those assets (the "Questech Collateral"[3]).   Many of the obligations under these agreements were cross-guaranteed by the various Questech defendants.   The Questech defendants were represented by Pu in the Questech state court litigation and claimed through Gus and attorney Pu that they no longer possessed the Questech Collateral.  Tom testified in a deposition that the Questech defendants had "abandoned" the Questech Collateral and that his company (whose name he refused to identify at the time) "found" the "abandoned" property sometime in April or May 2003.  He also testified that his company began using this newly "found" property to operate donut shops in the Questech defendants' "abandoned" locations.  Subsequently, and at the direction of the state court, Pu informed Questech in a letter dated January 2, 2004 that Tom's company that operated the shops was Food Management Group, LLC ("FMG").

Thereafter, Questech brought suit against FMG in federal District Court (the "Questech federal court litigation") to recover the Questech Collateral from FMG under a conversion and unjust enrichment theory.  In the Questech federal court litigation FMG, through Tom, asserted that it "found" the assets that were "abandoned" by the Questech defendants and operated those shops pursuant to franchise agreements issued to FMG by Dunkin' Donuts.  Attorney Pu also advanced the position that FMG was a Dunkin' Donuts franchisee and that as such FMG

---

[2]  The complaint(s) also named Gus, Tom, Anastasia Gianopoulos ("Stacy"), Mark Forster, Christopher P. Tsavoussis and Phillip Forster as defendants in their individual capacities as guarantors.

[3]  The Questech Collateral included all of the equipment, property, fixtures, leasehold improvements in the various donut shops and, arguably, the Dunkin' Donuts franchise agreements owned or held by the Questech defendants.

4

controlled the Questech Collateral and was using it to operate the donut shops. This assertion was patently false. As noted previously, it was the KMA entities and the Bronx Donut Bakery that held the franchise agreements and other collateral and were operating the donut shops using the Questech Collateral. In a written decision imposing sanctions against Tom and Pu for their misconduct in the litigation, Magistrate Judge Fox ruled that Tom and Pu affirmatively mislead Questech into believing that FMG held the franchises and thereby induced Questech to sue FMG for the return of the Questech Collateral rather than the parties that actually held the franchises, namely, KMA I, Inc., KMA II, Inc., KMA III, Inc., and Bronx Donut Bakery, Inc. Magistrate Judge Fox found that Tom's and Pu's conduct in concealing the true franchisees amounted to bad faith for the purposes of delay, and Pu was subsequently suspended from the practice of law as a result of his misconduct in the litigation.

As a result of the above-referenced obfuscation and efforts to "hide the ball" as to the true identity of the entities that possessed the Questech Collateral, Judge Colleen McMahon appointed a receiver over all of the Questech Collateral[4] by an order signed on May 21, 2004 (the "Receiver Order") based in part on the "real and present danger that the [Questech] Collateral could be transferred, sold, lost or squandered pendent lite." Receiver Order at 6. Due to the appointment of the receiver, on June 1 and 2, 2004 the Tom Companies each filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code and thereby became the debtors in this Court. *See* Tom's 1007-2 Affidavit. By an order of this Court dated June 4, 2004, the bankruptcy cases of these debtors were procedurally consolidated for the purpose of joint administration.

---

[4] Despite the fact that Gus, Tom and Pu were partially successful in hiding the true identity of the entities that legally held title to the Questech Collateral and hence were subject to suit for its return, there was apparently never much doubt as to the physical location of the Questech Collateral.

Questech promptly moved for the appointment of a trustee under 11 U.S.C. § 1104, alleging multiple acts of fraud and wrongdoing by Tom and Gus.  The motion was granted to the extent that the Court entered an order dated June 28, 2004 for the appointment of an examiner (the "Examiner").  By orders dated September 1 and 2, 2005 the Court authorized and confirmed the appointment of Janice B. Grubin as Chapter 11 Trustee (the "Trustee") in response to the latest in a series of motions for the appointment of a trustee filed by Questech following revelations of a continuing series of misconduct by Tom as owner and principal of the debtors, many of which were disclosed in Interim Reports filed by the Examiner.  Since her appointment the Trustee has operated and controlled the debtors' assets and affairs, including prosecution of the present adversary proceeding.

After the filing the debtors sought to settle the controversy with Questech.  In the course of settlement negotiations it became apparent that although the Gus Companies had transferred the franchise agreements relating to their Dunkin' Donuts shops to the KMA entities and the Bronx Donut Bakery, the Gianopoulos companies had not transferred all of their assets to the debtors.  In order to settle the controversy with Questech the debtors, the Gus Companies and Questech entered into a stipulation whereby all of the assets and liabilities of the Gus Companies were transferred to the debtors' estates.  The stipulation was "So Ordered" by this Court on December 1, 2004 and an amended stipulation was "So Ordered" by this Court on December 3, 2004.[5]

---

[5]  In the December 1 and 3 stipulations that were "So Ordered" by this Court, the assets and liabilities of two Gianopoulos companies, Argonne Enterprises, LLC and Food Systems, LLC, were erroneously transferred to the debtors.  Subsequently the mistake was discovered, and the assets and liabilities of Argonne Enterprises, LLC and Food Systems, LLC were removed from the debtors' estates as part of an order approving a later settlement between the debtors and certain Gianopoulos defendants that was signed by this Court on August 30, 2007.  Thus, Argonne Enterprises, LLC and Food Systems, LLC are not within the definition of the "Gus Companies" that transferred their assets and liabilities to the Tom Companies/debtors.

Because the Gus Companies' assets and liabilities were transferred to the debtors' estates without allocating them between the five estates and because various other transactions have been conducted between the debtors' estates and third parties without allocating the proceeds of those transactions between the estates, the debtors' bankruptcy estates will be the subject of a motion for substantive consolidation. For the purposes of this Decision, it is presumed that the debtors' estates have been substantively consolidated.

On August 16, 2004, Pu filed an identical proof of claim in each of the debtors' respective cases in the amount of $489,448.81. On December 28, 2004 Pu filed an amended proof of claim in each of the debtors' respective cases in which he recharacterized a portion of his original claim as a secured claim ($440,503.93), leaving the balance of the original claim as an unsecured claim ($48,944.88). Pu's proof of claim was based on a variety of legal services performed on behalf of a variety of parties. The Trustee has objected to the entirety of Pu's claims. Pu's right to payment from the debtors' estates for each of his various engagements will be considered *a la carte*.

### Discussion

### I.    The Secured/Unsecured Status of the Claim

One overarching question raised by Pu's claim is whether any part or all of his claim should be allowed as a secured claim to the extent that it is allowed. Pu claims a security interest in the proceeds of the Trustee's sale of the donut shops located at 132 Tuckahoe Road, Yonkers, New York; 1591 Central Park Avenue, Yonkers, New York; 987 Central Park Avenue, Yonkers, New York; and 307 South Broadway, Yonkers, New York, as well as in the damages arising from Matrix' breach of a contract with the Trustee to purchase those shops.[6] The Trustee has

---

[6] See this Court's decision in *Food Mgmt. Group, LLC v. Matrix Realty Group, Inc. (In re Food Mgmt. Group, LLC)*, 372 B.R. 171 (Bankr. S.D.N.Y. 2007).

7

objected to the secured status of Pu's claim on the grounds that there is no evidence to support

Pu's assertion of a security interest.  Pu relies entirely on one document to support the assertion

that he has a secured claim, a February 23, 2004 letter drafted by Pu and sent from Gus and Tom

to their attorney, Donald Wolfson, Esq., (the "Wolfson letter") which reads as follows:

> Dear Donald:
>
> We write this letter on behalf of ourselves and our companies (collec-tively, the "Gianopouloses").  As you know, the Gianopouloses expect to close shortly on some transactions involving companies controlled by Mr. Patel.  As you may also know, the Gianopouloses are indebted to Richard Pu and his law firms (collectively, "Pu") for legal fees.
>
> Please pay 90% of Pu's legal bills out of proceeds from the above-men-tioned closing.  (You may rely on copies of Pu's most recent bill as evidence of that indebtedness.)  Because Pu will be performing services in consideration of this instruction, please regard this instruction as being a power coupled with an interest and as being irrevocable.  Thank you.
>
> Sincerely,
>
> /s/ Gus Gianopoulos
> /s/ Tom Gianopoulos

*See* Defendant's exhibit VV2.

Pu's claim to a lien on or a security interest in the proceeds of the Trustee's sale of the

aforementioned shops (as well as in the damages arising from Matrix' breach of a contract with

the Trustee to purchase those shops) is frivolous for a host of separate and independent reasons.

The Wolfson letter does not identify the "transactions" that were expected to "close shortly" or

the "companies" that were supposed to be parties to those transactions, and there is no other

documentary evidence that identifies the contemplated transactions or parties thereto.[7]  Thus, the

Wolfson letter is on its face insufficient to create a lien on any assets because none is identified

---

[7]  Pu points to a May 24, 2003 contract for the sale of four donut shops to a company controlled by Mr. Patel and asserts that this contract was the transaction that was to "close shortly."  *See* Defendant's exhibit VV.  However, the contract contemplates a closing on or about July 1, 2003, and there is no evidence in the record other than Pu's hearsay testimony to connect the February 23, 2004 Wolfson letter to the May 24, 2003 contract.

by the document.  Further, the Wolfson letter does not even purport to create a lien on any exist-

ing property – it is merely an instruction to pay Pu "out of [the] *proceeds* from the above-men-

tioned closing" (emphasis added).  But, there was no closing of any kind between the

Gianopouloses and any company controlled by Mr. Patel, and accordingly there never were any

"proceeds."  Consequently, there was no property to which a lien could attach.  Even assuming

that there could be a lien on non-existent future property that never came into existence (an

obviously impossible assumption), the suppositious "lien" created thereby was never perfected

by any form of UCC or clerk's office or other filing to put creditors on notice and could not

possibly constitute a lien valid against existing or subsequent creditors or a bankruptcy trustee.

Because it is so patently obvious that the Wolfson letter *does not* grant Pu a security

interest in the proceeds of the Trustee's sale of the aforementioned shops, Pu's assertion that the

Wolfson letter is sufficient to grant him an equitable lien on those proceeds must be rejected as

equally frivolous.  In order to establish an equitable lien, New York law requires a "particular

agreement…to confer a security interest in the property at issue."  *Sec. Pac. Mortg. & Real*

*Estate Servs., Inc. v. Republic of Philippines*, 962 F.2d 204, 209 (2d Cir. 1992) (citing *James v.*

*Alderton Dock Yards*, 256 N.Y. 298, 303 (N.Y. 1931); *Datlof v. Turetsky*, 111 A.D.2d 364, 365

(N.Y. App. Div. 1985)).  Pu has not shown any agreement conferring upon him a security in-

terest in any property, much less a security interest in the proceeds now held by the Trustee.

To the extent that any of Pu's claim is allowed, it will be allowed as an unsecured claim.

## II.   **The Trustee's Overarching Objections**

The Trustee has advanced several objections that apply to many or all of the various

matters for which Pu seeks compensation.  The merits of these objections are considered in this

section and are applied to the various matters in Section III.

### A.    Claims for Services Rendered to Non-Debtors

Pu's claims for legal services can be divided into three broad categories: (1) claims based on services rendered to a debtor entity (2) claims based on services rendered to a company whose assets and liabilities were assumed by a debtor entity from a Gus Company and (3) claims based on services rendered to an unrelated non-debtor entity.  The Trustee objects to Pu's fees for services provided to any entity other than a debtor named herein on the grounds that unless Pu was providing services to a named debtor, he cannot satisfy the strictures of 11 U.S.C. §§ 502(b)(1) or 502(b)(4).  Section 502(b)(1) directs the court to allow a claim, except to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured."  Section 502(b)(4) directs the court to allow a claim "for services of an insider or attorney of the debtor" except to the extent that the claim "exceeds the reasonable value of such services."

### 1.    Claims for services rendered to the Gus Companies

Where the Trustee objects to Pu's fees for services rendered to one or more Gus Companies, the Trustee's argument that the fees should be disallowed because Pu did not represent one of the debtors must be rejected.  The debtors assumed the assets and the liabilities of the Gus Companies pursuant to orders of this Court dated December 1 and 3, 2004.  Because the debtors assumed the liabilities of the Gus Companies, Pu can demonstrate a right to payment from the debtors for his services to those companies as required by 11 U.S.C. § 502(b)(1) as long as he can demonstrate a right to payment from one of the Gus Companies.  Section 502(b)(4) is irrelevant where the services were rendered to non-debtor entities because on its face it only applies to the services of an attorney of the debtor, not to the services of an attorney to a company whose assets and liabilities were assumed by a debtor.

10

Nonetheless, even if Section 502(b)(4) did apply to Pu's services rendered to the Gus

Companies, the Trustee's argument that Section 502(b)(4) bars his claim to fees is misplaced.

The Trustee argues that where Pu's services were provided on behalf of a non-debtor, his ser-

vices provided *no* "value" or benefit to the debtors precisely because the services were provided

to a *non*-debtor, much less the reasonable value required by Section 502(b)(4).[8]  Putting aside the

fact that Pu almost certainly provided some value to the debtors' estates (as the Trustee construes

the term "value") by providing value to a company whose assets were assumed by the debtors

without cost to their estates, the Trustee misconstrues the concept of "value" as it is used in

Section 502(b)(4).  Section 502(b)(4) directs the bankruptcy court to disallow the claim of a

debtor's attorney for services rendered to the debtor where the claim "exceeds the reasonable

value of such services."  The Trustee's notion of "value" appears to be synonymous with the

concept of "benefit" such that if the attorney cannot point to a tangible benefit or "value" con-

ferred on the debtor as a result of his services, his claim must be disallowed.  If this conception

of "value" were taken seriously, any attorney who provided litigation services to a losing party

would not be entitled to a claim for his fees in that party's bankruptcy because the attorney could

not point to any tangible benefit or "value" conferred.  This is not what is meant by "value" in

Section 502(b)(4).  Rather, when Section 502(b)(4) uses the term "value" it is synonymous with

the concept of "market value" or "price" such that an attorney is entitled to fees up to the reason-

able market value of his services.  This interpretation is consistent with the purpose of the statute,

which is to prevent the debtor from defrauding its creditors by agreeing to pay its attorney exces-

---

[8]  Another aspect of the Trustee's argument is that even if "value" is equated with "market value," the reasonable
market value of legal services provided to a non-debtor is zero from the debtor's perspective.  This argument misses
the point where (as here) it was the non-debtor itself that hired the attorney because the reasonableness of the fee
must be assessed from the perspective of the party obliged to pay the fee.  Nonetheless, even if the reasonableness of
the fee were to be determined from the perspective of the debtors, the argument would still miss the point where (as
here) the represented companies' assets and liabilities were transferred to the debtors at no cost to the debtors'
estates because such an acquisition blurs any distinction between the value of services provided to the debtors and
those provided to the acquired entities.

sive fees. *See* S. Rep. 95-989, at 63 (1978), *reprinted in* 1978 U.S.C.C.A.N. at 5849 and H.R.

Rep. No. 95-989, at 353 (1978), *reprinted in* 1978 U.S.C.C.A.N. at 6309 (noting that Section

502(b)(4) "prevents overreaching by the debtor's attorneys and [the] concealing of assets by

debtors"). The Trustee has not argued that Pu's claim for fees exceeds the reasonable market

value for his services, and it appears from the record that his claim does not exceed the reason-

able value of his services. Accordingly, even if it were deemed to apply to Pu's services to the

Gus Companies, Section 502(b)(4) is not a bar to his claim for those services.

### 2.   Claims for services rendered to unrelated non-debtor entities

The Trustee's objection will be sustained in those instances where none of the entities

represented were debtors or had assets that were acquired by any of the debtors, because Pu

cannot demonstrate that he has any substantive right to payment from the debtors for those

services as required by 11 U.S.C. § 502(b)(1). To justify his claim to payment for services to

unrelated non-debtor entities, Pu asserts a theory that in providing services to those unrelated

non-debtor entities, he contributed to their continued vitality, and in so doing, he benefited

debtor FMG by protecting its revenue stream, some of which was allegedly derived from these

non-debtor entities. This frivolous argument not grounded in fact or law must be rejected out of

hand. Pu cites no proposition of law supporting the novel legal theory that where a lawyer or

other vendor performs work on behalf of an entity that is a customer or occasionally provides

revenue to a debtor, the lawyer may assert a claim for his work on behalf of the customer in the

debtor's bankruptcy. A debtor obviously owes no obligation to creditors of the debtor's cus-

tomers as a matter of elementary substantive law.

Aside from being a preposterous legal theory, the suggested theory is not supported by

the facts of this case. There is no evidence that the unrelated non-debtor entities Pu represented

provided any revenue at all to any debtor entity on a net basis. Pu demonstrated that at various points in time there were transfers between FMG and some of the non-debtor entities he represented. He did not show that the net of payments to FMG was greater than the payments from FMG. He made no showing of why the payments were made or what obligations they satisfied. The undisputed fact established in these bankruptcy proceedings is that the Gianopoulos brothers indiscriminately shuttled money between their various corporate entities without regard for corporate separateness or the rights of creditors of particular entities and in defiance of fraudulent conveyance law. There is simply no evidence that the unrelated non-debtor entities represented by Pu provided a revenue stream or benefit to debtor FMG.

Pu also argues that his representation of the unrelated non-debtor entities benefited the debtors because of cross-guaranty and cross-default provisions in the Dunkin' Donuts franchise agreements that created an all-for-one, one-for-all relationship between the debtors and those non-debtor entities whereby a default by one of the non-debtor entities on its franchise agreement with Dunkin' Donuts would create a contractual default under the franchise agreements held by the debtor entities. Thus, Pu argues that because his services kept the non-debtor entities from defaulting on their franchise agreements with Dunkin' Donuts, he was in effect benefiting the debtors by protecting their franchise agreements. This argument highlights the primary flaw in Pu's reasoning – conflating the concept of 'benefit' to the debtor entities with a right to payment. Even if Pu's services to non-debtor entities can be said to have benefited the debtors in some attenuated sense, that would not establish any legal obligation on the part of the debtors to pay Pu for such services or justify payment to Pu from their estates.

In any event, Pu overstates the benefit he may have conferred on the debtors through services to the non-debtor entities by overstating the strength of the cross-default and cross-guar-

anty provisions.  There is no evidence that there are any cross-default provisions connecting the

non-debtor franchisees represented by Pu and the debtors.  The purported cross-default provision

is contained in section 9.0.4 of the franchise agreements which indicates that a default will occur

under the franchise agreement "[i]f any other franchise agreement between FRANCHISEE and

FRANCHISOR or any affiliated entity is terminated by reason of FRANCHISEE's default there-

under…."  *See* Defendant's exhibit T at 318C.  This provision does not extend to any franchise

agreements held by entities other than the FRANCHISEE (a defined term limited to the particu-

lar company signing the agreement).  In contrast, the cross-guaranty provision found in section

5.6 of the franchise agreements does extend beyond the franchisee in question by reaching the

partners, members or shareholders of the franchisee – creating a cross-guaranty between all

franchisees wherein the same individuals hold interests.  *See* Defendant's exhibit T at 317.

However, this cross-guaranty is limited in two respects: (1) it only extends to the defaulting

franchisee's obligations to Dunkin' Donuts, not to all of the franchisee's obligors, most notably,

the franchisee's landlord and (2) it is limited to the interests of the common partner(s), mem-

ber(s) or shareholder(s) in the non-defaulting franchisee.  Given that there was no cross-default

provision connecting the non-debtor entities represented by Pu and the debtors and given that the

cross-guaranty provisions are so limited in scope, Pu's services to the non-debtor entities bene-

fited the debtors in only the most attenuated sense, if they benefited the debtors at all.  There is

no legal basis for allowing Pu's claim based on this attenuated benefit.

Where Pu provided services to unrelated non-debtor entities, his claim to payment from

the debtors' estates for those services must be denied because he has no legally enforceable right

to payment.

### B.     The Effect of Multiple Clients, Including Non-Debtor Clients

In many of the matters for which Pu seeks payment from the debtors, Pu represented debtor or Gus Company clients as well as unrelated non-debtor clients in the same litigation. The Trustee asserts that Pu is not entitled to payment for these services because he represented these various clients "with conflicting or potentially conflicting interests without a conflict waiver." *See* Objection at ¶ 36. The Trustee's argument is based on the legal principle that an attorney is not entitled to fees where the attorney violates the Disciplinary Rules in the course of his services, *see, e.g.*, *Pessoni v. Rabkin*, 220 A.D.2d 732 (N.Y. App. Div. 1995), and the Trustee contends that Pu violated 22 NYCRR § 1200.24 by representing clients with conflicting or potentially conflicting interests. The Trustee has not identified any actual or potential conflicts between any of Pu's clients in any matter for which he now seeks payment. Instead, the Trustee merely asserts the tautology that the various clients had interests that were distinct from one another in some unrelated context. Without evidence that the various clients Pu represented had conflicting interests *in the representation in question*, Pu's claim cannot be denied on the basis of that non-existent conflict because his representation was not in violation of the Disciplinary Rules. *See, e.g.*, 22 NYCRR § 1200.24. Indeed, in the cases cited by the Trustee where an attorney was denied a fee on the basis of a conflict of interest, the courts found an actual conflict of interest in the representation in question. *See, e.g.*, *Pessoni v. Rabkin*, 220 A.D.2d 732 (N.Y. App. Div. 1995); *Ulico Casualty Co. v. Wilson, Elser, Moskowitz, Edleman & Dicker*, 843 N.Y.S.2d 749 (N.Y. Sup. Ct. 2007). The mere fact that Pu represented some additional parties with no legal relation to these debtors does not in and of itself present a bar to Pu's claim for fees so long as Pu has an enforceable claim against the debtors sufficient to satisfy 11 U.S.C. § 502(b)(1).

Some of the additional parties Pu represented were debtor and/or Gus Company insiders. The fact that Pu represented insiders in addition to the debtors and/or Gus Companies is not a *per se* bar to his claim from the debtors for that representation either.  There is no legal bar preventing a company from hiring an attorney to jointly represent the company and its insiders.  In fact, the United States District Court for the Southern District of New York has held that a closely-held company receives fair consideration for payments to an attorney that represents both the company and its insiders where the representation "effectively advance[s] the interests of all defendants simultaneously."  *Gala Enters. v. Hewlett Packard Co.*, 989 F. Supp. 525, 530 (S.D.N.Y. 1998) (holding that pre-petition payments made by a closely-held company/debtor to an attorney representing both the company and two insiders were not fraudulent conveyances under N.Y. Debt. & Cred. Law § 273 because the company received fair consideration for the attorney's services that advanced the interests of all of the defendants simultaneously)  (citations omitted).  The Trustee has not alleged that Pu's representation of the insiders along with the debtors and/or Gus Companies did not advance the interests of all the parties Pu represented simultaneously, and from the record it appears that Pu's services did advance the interests of all parties he jointly represented simultaneously.  Accordingly, Pu's joint representation of insiders of the debtors and/or Gus Companies is not a bar to his claim against the debtors.

> ### C.    The Engagement Letter Issue

The Trustee further objects to most of Pu's claims for fees on the grounds that he has failed to demonstrate that he provided the requisite engagement letters and/or retainer agreements to his client(s).  22 NYCRR § 1215.1 contains the following requirement:

> (a) Effective March 4, 2002, an attorney who undertakes to represent a client and enters into an arrangement for, charges or collects any fee from a client shall provide to the client a written letter of engagement before commencing the representation, or within a reasonable time thereafter:

(1) if otherwise impracticable; or

(2) if the scope of services to be provided cannot be determined at the time of the commencement of representation.

For purposes of this rule, where an entity (such as an insurance carrier) engages an attorney to represent a third party, the term client shall mean the entity that engages the attorney. Where there is a significant change in the scope of services or the fee to be charged, an updated letter of engagement shall be provided to the client.

(b) The letter of engagement shall address the following matters:

(1) explanation of the scope of the legal services to be provided;

(2) explanation of attorney's fees to be charged, expenses and billing practices; and

(3) where applicable, shall provide that the client may have a right to arbitrate fee disputes under Part 137 of this Title.

(c) Instead of providing the client with a written letter of engagement, an attorney may comply with the provisions of subdivision (a) of this section by entering into a signed written retainer agreement with the client, before or within a reasonable time after commencing the representation, provided that the agreement addresses the matters set forth in subdivision (b) of this section.

22 NYCRR § 1215.1 does not apply to "(a) representation of a client where the fee to be charged is expected to be less than $ 3,000; [or] (b) representation where the attorney's services are of the same general kind as previously rendered to and paid for by the client…."  22 NYCRR § 1215.2.

Pu provided two engagement letters to Gus and Tom at FMG.  The first, dated July 1, 2002, covered the three litigations that made up the so-called Dunkin' Donuts litigation.  *See* Defendant's exhibit W.  The second, dated March 28, 2003, was identical to the first except that it covered "Litigation and Corporate Matters" and contained an additional provision regarding retention in corporate matters.  *See* Defendant's exhibit X.  The Trustee agrees that the first engagement letter was sufficient to allow Pu to recover fees with respect to the Dunkin' Donuts

17

litigation, yet contends that the second letter is insufficient to support any additional recovery by Pu because of its generic nature.

The March 28, 2003 engagement letter is sufficient for Pu to recover his fees for services rendered in litigation matters.  Nothing in 22 NYCRR § 1215.1 dictates the level of detail required when explaining the scope of services to be provided, and the Trustee has not cited any cases where an attorney has actually provided an engagement letter but was unable to recover fees because the engagement letter was inadequate.  The engagement letter was addressed to Tom and Gus at FMG and explained that Pu would represent "you" in litigation and would serve as "your" attorney of record in the event that a suit was commenced.  This is an adequate explanation of the scope of Pu's services – he would provide all needed legal services in connection with litigation.[9]  The primary question raised by the engagement letter is this: Who was the client?  From the facts before me it is evident that the "you" and "your" in Pu's engagement letter referred to Gus and Tom in their individual capacities, as well as in their capacities as the principals of their various companies.  Thus, the March 28, 2003 engagement letter provides the foundation for Pu's claim to legal fees on account of litigation services provided after that date.[10]

Even in the absence of an engagement letter or other exception from 22 NYCRR § 1215.1, Pu can recover his fees under a *quantum meruit* theory.[11]  To recover under a *quantum*

---

[9]  The engagement letter also purported to apply to corporate matters, indicating that "[w]ith respect to corporate matters, the firm will provide you with the services set forth in the 3/27/03 retainer agreement recently transmitted to you."  Because the March 27, 2003 retainer agreement has not been provided, the engagement letter does not satisfy Pu's obligations under 22 NYCRR § 1215.1 with respect to corporate matters.  Only one of the matters for which Pu seeks payment was a "corporate" matter (*see* "Miscellaneous Matter" (3), part III.H., *infra*).  For this matter, Pu must rely on a *quantum meruit* theory to be entitled to payment for services rendered.

[10]  For fees incurred on matters other than the Dunkin' Donuts litigation prior to that date, Pu must rely on a *quantum meruit* theory to be entitled to payment for services rendered.

[11]  Pu also argues that an engagement letter was not necessary under 22 NYCRR § 1215.2(b) because Pu had previously rendered legal services "of the same general kind" (*i.e.*, commercial litigation) to the debtors and/or Gus Companies and had been paid for those services.  *See* Defendant's exhibit SS at 759, 764, 783; Plaintiff's exhibits 1, 3, 5, 7, 8, 10, 11.  To the extent that Pu provided commercial litigation services to entities from which he had

18

*meruit* theory, Pu must demonstrate that the terms of the alleged fee arrangement were fair, fully understood and agreed to by the client. *See Seth Rubenstein, P.C. v. Ganea*, 833 N.Y.S.2d 566, 573 (N.Y. App. Div. 2007). If they were, Pu is entitled to compensation for the fair and reasonable value of his services. *See id.*

From the evidence before me, it is clear that Pu was retained by Gus and Tom in their individual capacities as well as by the various entities whose interests he represented from time to time, and that the terms of the fee arrangement were fair, fully understood and agreed to by those entities. The terms of the fee arrangement were fair in that Pu charged between $250 and $270 per hour plus expenses for commercial litigation services – a rate that is certainly fair for those kinds of services.[12] The terms of the fee arrangement were also fully understood and agreed to by the various entities Pu represented. Pu sent two engagement letters to Gus and Tom – the principals and sole shareholders (either individually or jointly) of the various debtors or Gus Companies Pu represented – clearly outlining the terms of his retention. He has also provided an unsigned retainer agreement between (i) all of the debtors herein except FMG, the Gus Companies, Benni's LLC, Argonne Enterprises, LLC, Food Systems, LLC, Gus and Tom individually, and Mark and Philip Forster individually and (ii) his former law firm, for services in the Questech litigation. *See* Defendant's exhibit Y. The retainer agreement contains the same

---

previously received payment for commercial litigation services, this argument has merit. The evidence shows that FMG paid Pu for commercial litigation services as early as June 25, 2003 and therefore Pu does not need an engagement letter to be entitled to payment for services rendered to FMG after that date. While there is evidence that he was paid for his services at earlier points in time, there is no evidence that a debtor or Gus Company made those payments and, therefore, there is insufficient evidence to waive the engagement letter requirement with respect to Pu's claim to fees from any debtor or Gus Company on the basis of those prior payments.

[12] For this reason, the amounts billed by Pu for his services do not exceed the fair and reasonable value of his services for the purposes of *quantum meruit* recovery.

material terms as the engagement letters.[13]  Pu was partially paid for his services under this fee

arrangement on at least ten separate occasions.  *See* Defendant's exhibit SS at 759, 764, 783;

Plaintiff's exhibits 1, 3, 5, 7, 8, 10, 11.  Additionally, Gus and Tom (both individually and on

behalf of their "companies") agreed to pay Pu 90% of his legal bills out of the proceeds of a

contemplated transaction.  *See* point I, above.  This body of evidence establishes that the terms of

Pu's retention were fully understood and agreed to by the debtors and the Gus Companies

through their principals, and Pu is entitled to payment from the debtors for the fair and reason-

able value of his services rendered to the debtors or the Gus Companies.  One of the terms of

Pu's retention was that each of the entities or persons Pu represented would be jointly and

severally liable to pay Pu for his services to the group of persons or entities whose interests he

represented in a given matter.  This fact is clearly inferred from the various entities' agreements

to joint representation and is further evidenced by the unsigned retainer agreement which expli-

citly provides for joint and several liability.  *See* Defendant's exhibit Y.[14]  However, there is in-

sufficient evidence to establish that any debtor or Gus Company agreed to be liable for services

rendered entirely to unrelated non-debtor entities or individuals, and therefore Pu is not entitled

to payment for services rendered exclusively to entities that are not debtors or whose assets and

liabilities were not assumed by the debtors.

### D.      The Post-Petition Claims

Pu has claimed $13,185.45 for services and expenses rendered or incurred after the filing

of the petition.  Obviously these services or expenses cannot be pre-petition obligations of the

debtor.  To be entitled to a claim for these post-petition services and expenses, Pu would have to

---

[13]  The unsigned retainer agreement did contain the additional proviso that the various clients would be jointly and severally liable on the debt.

[14]  It should be noted in this regard that to the extent Pu receives (or has received) payment for his services that form the basis for his claim from any entity he represented, his claim must be reduced by that amount.

be retained under 11 U.S.C. § 327 and apply for compensation under 11 U.S.C. § 330.[15]  Pu was

not retained under Section 327 and has not applied for compensation under Section 330 and can-

not be entitled to any claim from the debtors' estates in respect of the aforementioned services or

expenses.

## III.    **The Various Matters**

### A.    **14th Street**

Pu seeks $27,473 on account of services performed in the so-called "14th Street litiga-

tion."  Pu represented defendants New York Food Group, LLC and Food Systems, LLC.  None

of the entities Pu represented were debtors herein or Gus Companies nor were any assets in-

volved transferred to the debtors.  For the reasons articulated previously, Pu does not have an en-

forceable claim against the debtors for those services, and his claim must be disallowed under 11

U.S.C. § 502(b)(1).

### B.    **PF-NY**

Pu seeks $37,743.11 on account of services performed in the so-called "PF-NY litiga-

tion."  Pu represented defendants New York Food Group, LLC, Food Systems, LLC, Gus, Tom

and Mark Forster.  None of the entities Pu represented were debtors herein or Gus Companies

nor were any assets involved transferred to the debtors.  For the reasons articulated previously,

Pu does not have an enforceable claim against the debtors for those services, and his claim must

be disallowed under 11 U.S.C. § 502(b)(1).

### C.    **Dunkin' Donuts Litigation**

Pu seeks $23,403.51 on account of services performed in the so-called "Dunkin' Donuts

litigation."  "Dunkin' Donuts litigation" was a general heading under which Pu billed for his

---

[15]  Attorneys may also make an application under 11 U.S.C. § 503(b)(3)(D) for compensation for post-petition ser-
vices where they have made a substantial contribution to the case.  Pu has not made a substantial contribution to this
case and would not be entitled to payment under that provision.

services in connection with three separate suits brought by Dunkin' Donuts against three different groups of defendants. These suits were (1) *Dunkin' Donuts Inc. v. Harrison Donuts, Inc. et al.*, (2) *Dunkin' Donuts Inc. v. New York Food Group, LLC et al.* and (3) *Dunkin' Donuts Inc. v. East Tremont Donuts, Inc. et al.* In the *Harrison Donuts, Inc.* and *East Tremont Donuts, Inc.* actions Pu represented at least one Gus Company defendant. However, in the *New York Food Group, LLC* action none of the defendants Pu represented were debtors or Gus Companies. For the reasons articulated previously, Pu has an enforceable claim against the debtors for his services in the *Harrison Donuts, Inc.* and *East Tremont Donuts, Inc.* actions but does not have an enforceable claim against the debtors for his services in the *New York Food Group, LLC* action. Because Pu billed for his services in these three actions under one general heading and because none of the parties have provided the Court with an allocation of Pu's fees between the various actions, Pu shall be entitled to two-thirds of the total amount he seeks and shall have an allowed claim in the amount of $15,602.34.

### D.    Questech v. FMG

Pu seeks $180,168.91 on account of representing FMG in the Questech federal court litigation. The Trustee objects to Pu's fees on the grounds that he is not entitled to fees due to his misconduct in the Questech federal court litigation.

In New York, "'[i]t is well settled that an attorney who engages in misconduct by violating the Disciplinary Rules is not entitled to legal fees for *any* services rendered.'" *In re Bruno*, 327 B.R. 104, 111-112 (Bankr. E.D.N.Y. 2005) (quoting *Pessoni v. Rabkin*, 633 N.Y.S.2d 338, 338 (N.Y. App. Div. 1995) (other quotations and citations omitted) (emphasis added); *see also First Nat'l Bank v. Pepper*, 454 F.2d 626, 633 (2d Cir. 1972); *Quinn v. Walsh*, 795 N.Y.S.2d 647, 648 (N.Y. App. Div. 2005); *In re Winston*, 625 N.Y.S.2d 927 (N.Y. App.

Div. 1995); *Shelton v. Shelton*, 542 N.Y.S.2d 719 (N.Y. App. Div. 1989); *Brill v. Friends World College*, 520 N.Y.S.2d 160 (N.Y. App. Div. 1987).[16, 17]  It cannot be questioned that Pu engaged in misconduct by violating the Disciplinary Rules in the Questech federal court litigation, resulting in his suspension from the practice of law.

Pu's representation of FMG was substantially an effort to prevent Questech from learning the true identity of the entities that possessed the Questech Collateral.  In this regard, Magistrate Judge Fox sanctioned Pu for advancing the "preposterous litigation position that FMG was the finder of abandoned property" and in so doing "effectively imped[ing] QuesTech from learning the identity of the party which held the collateral and therefore the party subject to suit." Plaintiff's exhibit 23 at 10-11 (Magistrate Judge Fox' March 8, 2005 Decision and Order).  Pu was also sanctioned for continuing to falsely assert that FMG was the franchisee in possession of the Questech Collateral, allowing his client Tom to perjure himself in a deposition and lying to the court by asserting that the franchise agreements had been produced in discovery when, in fact, Pu "knew that such an agreement(s) did not exist."  *Id.* at 11-13.  Magistrate Judge Fox' findings of misconduct were expressly affirmed by District Judge McMahon who noted that "far from being left with the 'definite and firm conviction' that Magistrate Judge Fox made a mistake, I am

---

[16]  Misconduct that does not violate the disciplinary rules may not result in total forfeiture of the fee.  *See, e.g.*, *Joseph Brenner Assocs. v. Starmaker Entm't*, 82 F.3d 55, 57-59 (2d Cir. 1996); *Mar Oil, S.A. v. Morrissey*, 982 F.2d 830, 840 (2d Cir. 1993); *In re Rosenman & Colin*, 850 F.2d 57, 63-64 (2d Cir. 1988).

[17]  Some cases have held that misconduct violative of the Disciplinary Rules which was unrelated to the services rendered but was instead associated with the business relationship between the attorney and her client (*e.g.*, billing and retention) may not be an absolute bar to recovery.  *See, e.g.*, *Realuyo v. Diaz*, 2006 U.S. Dist. LEXIS 11420 at *25-*28 (S.D.N.Y. Mar. 17, 2006); *Louima v. City of New York*, 2004 U.S. Dist. LEXIS 28886 (E.D.N.Y. Sept. 28, 2004), *aff'd sub nom. Roper-Simpson v. Scheck*, 163 Fed. Appx. 70 (2d Cir. 2006); *In re Cooperman*, 83 N.Y.2d 465, 475 (N.Y. 1994).  However, because Pu's misconduct was related to the actual legal services rendered, these cases are inapposite.

left with the firm conviction that he got it right." *See* Plaintiff's exhibit 24 at 2 (Judge

McMahon's April 7, 2005 Decision and Order).[18]

As part of the resulting disciplinary proceeding in federal court, Pu entered into a stipu-

lation with the Grievance Committee in which he stipulated as follows:

> 3.    In the course of [his] representation [of FMG], Pu advanced the
> theory that FMG had acquired title to certain property as the finder of abandoned
> property. At the time of advancing this theory, Pu had reason to know that the
> property had in effect been transferred to companies controlled by [Tom].
>
> 4.    Pu's advancement of this theory was prejudicial to the administra-
> tion of justice in violation of Disciplinary Rules 1-102(a)(1) ("A lawyer shall not
> violate a Disciplinary Rule.") and 1-102(b)(5) ("A lawyer shall not engage in con-
> duct that is prejudicial to the administration of justice.").
>
> 5.    Additionally, in the course of the *FMG v. Questech* litigation, Magistrate
> Judge Fox inquired of Pu whether his client had produced to Questech certain franchise
> agreements allegedly held by FMG.  Pu indicated to the court that he was unsure whether
> those documents had been produced in discovery and represented that he would follow
> the Court's instruction that he look for those documents produced by his client. At the
> time Pu made these representations, he knew that no such franchise agreements existed.
>
> 6.    This conduct was also prejudicial to the administration of justice in vio-
> lation of Disciplinary Rules 1-102(a)(1) and DR 1-102(b)(5).

*See* Plaintiff's exhibit 28 at 2-3.  Pursuant to the stipulation Pu was suspended from the practice

of law in the Southern District of New York for a period of six months.  Pu was also suspended

from the practice of law in the New York State courts for one year as a result of his misconduct.

*See In re Pu*, 826 N.Y.S.2d 43 (N.Y. App. Div. 2006). The Appellate Division found that Pu's

admitted actions also clearly violated DR 1-102(A)(4) which prohibits "conduct involving dis-

honesty, fraud, deceit or misrepresentation" and DR 7-102(A)(5) which prohibits "knowingly

mak[ing] a false statement of law or fact" in the representation of a client.  *Id.* at 47.

---

[18]  Judge McMahon did vacate the amount of Magistrate Judge Fox' award of monetary sanctions and remanded the
issue for recalculation.  *See* Plaintiff's exhibit 24 at 2 (Judge McMahon's April 7, 2005 Decision and Order).

Closely related to the rule that an attorney is not entitled to any fees for legal services where he or she violates the Disciplinary Rules, New York law contains an additional, and apparently independent, rule that an attorney is not entitled to any fees for legal services where he or she is discharged for cause. *See Universal Acupuncture Pain Servs., P.C. v. Quadrino & Schwartz, P.C.*, 370 F.3d 259, 263 (2d Cir. 2004); *Teichner v. W & J Holsteins, Inc.*, 64 N.Y.2d 977, 979 (N.Y. 1985). Pu was fired by FMG for cause. *See* Plaintiff's exhibit 24 at 3 (Judge McMahon's April 7, 2005 Decision and Order).

In spite of these well-established rules that mandate forfeiture of Pu's fees, Pu argues that he should only be required to forfeit those fees that relate to his misconduct. His argument is based on *Musico v. Champion Credit Corp.*, 764 F.2d 102 (2d Cir. 1985), a Second Circuit case that interpreted New York's faithless servant doctrine. *Musico* held that where "(1) the parties had agreed that the agent will be paid on a task-by-task basis (*e.g.*, a commission on each sale arranged by the agent), (2) the agent engaged in no misconduct at all with respect to certain tasks, and (3) the agent's disloyalty with respect to other tasks 'neither tainted nor interfered with the completion of' the tasks as to which the agent was loyal," New York's faithless servant doctrine does not prevent the agent from being paid for the tasks where the agent did not engage in misconduct. *Phansalkar v. Anderson Weinroth & Co., L.P.*, 344 F.3d 184, 205 (2d Cir. 2003) (quoting and interpreting *Musico*, 764 F.2d 102). While *Musico* may limit the reach of the faithless servant doctrine of general agency law, *Musico* does not alter the attorney-specific rules that attorneys are not entitled to fees for any services rendered where they violate the Disciplinary Rules in the course of rendering those services or are discharged for cause. The very existence of the Disciplinary Rules underscores the fact that the attorney-client relationship is a

special kind of agency relationship with its own governing rules that are more restrictive than those interpreted by *Musico* and its progeny.[19]

Even if *Musico* did apply to attorneys who violate the Disciplinary Rules or are discharged for cause, Pu would still not be entitled to fees because he cannot satisfy its strictures. Pu does not satisfy *Musico*'s requirement of showing an agreement that he would be paid on a task-by-task basis. In the engagement letter that Pu relies upon to form the basis for his representation, Pu informed the client that he would "provide you with legal representation in the litigation." *See* Defendant's exhibit X. This generic description, far from evidencing a task-by-task engagement, evidences an agreement that Pu would be paid for his services in the litigation as one task.[20] The absence of a task-by-task agreement is further evidenced by the fact that Pu billed all of his services in the Questech federal court litigation under the same general heading. Because Pu cannot demonstrate that he was retained on a task-by-task basis in the Questech federal court litigation, he also cannot meet *Musico*'s second requirement of demonstrating that he engaged in no misconduct at all with respect to certain tasks. Pu was hired to complete one

---

[19] Pu cites two cases purportedly applying *Musico*'s limitation on forfeiture to attorneys. In one, *Schneider v. Wien & Malkin LLP*, 2004 NY Slip Op 51328U (N.Y. Sup. Ct. 2004), the agent that engaged in misconduct was a law firm, though it performed both legal and non-legal services. The firm was employed as the "supervisor" of several partnerships and its duties included "payment of mortgages and taxes, performance of accounting functions involving tax returns and monthly financial statements, and conduct[ing] of annual partnership meetings." *Id.* at 2. The court found that the firm breached its fiduciary duties to its client, but the firm was not discharged for cause and the court did not make an express finding that the firm violated the Disciplinary Rules. To the extent that it denied the firm's fees, it did so under the faithless servant doctrine and not the Disciplinary Rules. The case is inapposite because the firm was not discharged for cause and the court did not deny the fees for a violation of the Disciplinary Rules. In the other case, *In re Winston*, 625 N.Y.S.2d 927 (N.Y. App. Div. 1995), Pu suggests that the court limited the attorneys' forfeiture to the period when their work was tainted by misconduct. However, the court did not make such a ruling; it merely remanded the issue of forfeiture for services performed prior to the misconduct because there were questions of fact bearing on the attorneys' entitlement to compensation prior to the misconduct. *Id.* at 928. Even if Pu's characterization of the case were correct, the purported time-based rule limiting forfeiture to the services provided after the misconduct is quite different from *Musico*'s task-based rule limiting forfeiture to the services actually tainted by the misconduct. Under Pu's reading of *Winston* he would still only be entitled to fees incurred prior to February 25, 2004 (totaling $2,637.25) when his misconduct in the Questech federal court litigation began by developing the abandoned property theory. *See* Defendant's exhibit SS at 1029.

[20] The unsigned retainer agreement is in accord. It states: "Clients retain the Firm to represent Clients in connection with a dispute with Questech Financial LLC, and the Firm agrees to provide such representation." *See* Defendant's exhibit Y.

task, to represent FMG in the federal court litigation with Questech, and he committed misconduct in the course of completing that task. Finally, Pu cannot demonstrate compliance with *Musico*'s third requirement that his misconduct "neither tainted nor interfered with the completion of" the tasks as to which he did not engage in misconduct. *Musico*, 764 F.2d at 114. Pu's misconduct cast a pall over the entire Questech federal court litigation and interfered with Pu's completion of the litigation by directly leading to an intervening bankruptcy (along with its automatic stay), spawning a lengthy inquest into Tom's and Pu's conduct and by resulting in Pu's suspension from the practice of law.

For the above cited reasons, Pu is not entitled to any fees in connection with the Questech federal court litigation because Pu does not have an enforceable claim against any of these debtors for those services, and his claim must be disallowed under 11 U.S.C. § 502(b)(1).[21]

## E.    <u>Questech Litigation NY</u>

Pu seeks $112,453.31 on account of services performed in the Questech state court litigation. Pu represented the Gus Companies, Argonne Enterprises, LLC, Food Systems, LLC, Tom, Gus, Christopher Tsavoussis, Mark Forster and Philip Forster as defendants in the actions brought by Questech in New York State court seeking to foreclose upon the Questech Collateral. The Trustee has objected to Pu's claim for fees on the grounds that he engaged in misconduct in the Questech state court litigation.

In both the state and federal actions, Questech sought to discover the true identities of the entities in possession of the Questech Collateral. In both the state and federal actions Pu, Gus and Tom engaged in misconduct by "hiding the ball" as to the true identities of the entities in possession of the Questech Collateral. After Tom refused to identify the name of the franchisee

---

[21] $11,773.92 was billed on account of fees and expenses that were incurred post-petition and these fees cannot be allowed for additional reasons articulated previously.

of the shops he was operating out of the Gus shops' former locations, the law clerk to the state court judge handling the Questech state court litigation directed Pu to disclose the name of the company through which Tom operated the Dunkin' Donuts shop at 755 North Broadway.  By a letter dated January 2, 2004, Pu responded by stating "the name of Tom's company was FMG." This statement was false and intentionally misleading.  Judge McMahon ruled that the letter was "indisputably part of" the "scheme designed to mislead QuesTech and to delay its ability to re-cover the collateral for its loans to the Gianopoulos ventures."  *See* Plaintiff's exhibit 24 at 7 (Judge McMahon's April 7, 2005 Decision and Order).  This "scheme designed to mislead QuesTech" was implemented by Pu at least as far back as September 2003 when Pu asserted an affirmative defense in one of the state court actions that the defendant did not hold legal title to the Questech Collateral.  As a result of Pu's false and intentionally misleading response to a direction of the state court, Questech sued the wrong party (FMG) in federal court.  Pu's con-tinued misrepresentations of this point in the federal action resulted in a sanctions order being entered against Pu and his suspension from the practice of law.

Pu asserts that he should not be denied a fee in the state court litigation because he has never been sanctioned for his misconduct in that litigation.  This is ironic given that in his efforts to get Magistrate Judge Fox' ruling of misconduct in the federal action overturned by Judge McMahon, Pu argued that Magistrate Judge Fox' sanctions order was based on his misconduct in the state court litigation and that therefore Magistrate Judge Fox had improperly sanctioned him for his conduct in the federal court litigation.  *See* Plaintiff's exhibit 24 at 5 (Judge McMahon's April 7, 2005 Decision and Order).  Nonetheless, the denial of an attorney's fees for misconduct is not predicated on a prior *finding* of misconduct but on the underlying misconduct itself.  Pu's conduct in the Questech state court litigation as outlined above violated 22 NYCRR §

28

1200.3(a)(4) which prohibits engaging in "conduct involving dishonesty, fraud, deceit or misrepresentation;" 22 NYCRR § 1200.33(a)(5) which prohibits "knowingly mak[ing] a false statement of law or fact" in the representation of a client; 22 NYCRR § 1200.3(a)(5) which prohibits engaging in "conduct that is prejudicial to the administration of justice;" 22 NYCRR § 1200.33(a)(8) which prohibits knowingly engaging in "conduct contrary to a disciplinary rule" in the representation of a client and 22 NYCRR §1200.3(a)(1) which prohibits violating a Disciplinary Rule.  In light of Pu's documented misconduct in the Questech state court litigation that violated the Disciplinary Rules, Pu is not entitled to any fees for his services in that matter.[22]

Alternatively, Pu is not entitled to fees for his services in the Questech state court litigation because he was discharged for cause.  *See, e.g.*, *Universal Acupuncture Pain Servs., P.C. v. Quadrino & Schwartz, P.C.*, 370 F.3d 259, 263 (2d Cir. 2004); *Teichner v. W & J Holsteins, Inc.*, 64 N.Y.2d 977, 979 (N.Y. 1985).

Pu does not have an enforceable claim against any of these debtors for his services in the Questech state court litigation, and his claim for those services must be disallowed under 11 U.S.C. § 502(b)(1).

## F.    Food Systems v. Gramercy Arms

Pu seeks $12,364.72 on account of services performed in the *Food Systems v. Gramercy Arms* litigation.  Pu represented plaintiff Food Systems, LLC.  None of the entities Pu represented were debtors herein or Gus Companies nor were any assets involved transferred to the

---

[22]  As noted previously, *Musico* does not limit Pu's forfeiture because *Musico* does not apply to an attorney's forfeiture of fees for a violation of the Disciplinary Rules.  However, even if *Musico* did apply it would not provide a basis for limiting Pu's forfeiture because he cannot satisfy its requirements.  Pu cannot show an agreement that he was to be paid on a task-by-task basis (*see* discussion at III.D., *supra*) and consequently cannot show that he engaged in any particular tasks without committing misconduct.  Pu's misconduct tainted the entire Questech state court litigation by leading to the federal court action which resulted in the appointment of a receiver over the defendants' assets.  His misconduct also interfered with his completion of the litigation because it led to his suspension from the practice of law and his discharge.

debtors.  For the reasons articulated previously, Pu does not have an enforceable claim against

the debtors for those services and his claim must be disallowed under 11 U.S.C. § 502(b)(1).

### G.    Liff Loan

Pu seeks $167.50 on account of services performed in the so-called "Liff loan" matter.

The "Liff loan" was apparently an undocumented loan advanced from Gus to Scott and Christina

Liff on December 6, 2000 in the amount of $125,000.  *See* Plaintiff's exhibits 92 and 95.  The

Liffs attempted to repay the loan by a check post-dated March 23, 2001 from Christina Liff to

the order of "Food Management Services Corp." that was presented on March 20, 2001 and

refused due to insufficient funds.  *See* Plaintiff's exhibits 93 and 94.  Pu initially billed Gus and

Tom individually for these services (*see* Defendant's exhibit SS at 808) on February 13, 2003

and subsequently submitted invoices reflecting these services to John Reuther at Food Manage-

ment Service (*see, e.g.*, Defendant's exhibit SS at 1022).  There is no evidence that any debtor

entity or Gus Company was the original obligee on the Liff loan, and Pu has not presented any

evidence that any debtor entity or Gus Company ever became the obligee and, accordingly, there

is no evidence that any services rendered on account of the Liff loan were rendered on behalf of

a debtor entity or Gus Company.  Therefore, Pu does not have an enforceable claim against any

of these debtors for those services and his claim must be disallowed under 11 U.S.C. § 502(b)(1).

### H.    Miscellaneous Matters

Pu seeks $1,122.08 on account of services performed in miscellaneous matters.

(1) Pu claims $312.50 on account of a landlord-tenant issue at one of the Gus

Company shops.  *See* Defendant's exhibit SS at 821.  Because Pu represented a Gus

Company whose assets and liabilities were assumed by the debtors herein, for the reasons

30

articulated previously, Pu has an enforceable claim against the debtors for those services, and his claim must be allowed.

(2) Pu claims $267.08 on account of services provided to the shop located on 14th Street in Manhattan.  Pu's time entries characterize the work as "Conference T. Gianopoulos re: 14th Street delinquency" and "Conference Degen and T. Gianopoulos re: 14th Street shop."  There is no evidence that any of the debtor entities or Gus Companies ever held an interest in the 14th Street shop in Manhattan and, for the reasons articulated previously, Pu does not have an enforceable claim against any of these debtors for those services, and his claim must be disallowed under 11 U.S.C. § 502(b)(1).

(3) Pu claims $437.50 on account of consultations with Tom regarding a possible Panera Bread franchise opportunity.  From the bills submitted by Pu it is impossible to tell who Pu represented in these consultations.  *See* Defendant's exhibit SS at 864 and 879.  The various entries mention an "option to purchase in franchise agreement."  The burden is on Pu to demonstrate that the services were performed on behalf of the debtors or the Gus Companies since the Trustee objected on the grounds that these services were not performed for the debtors.  *See Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 21 (2000) (holding that the ultimate burden of proof as to the validity or invalidity of a claim lies with the party who has the burden of proof under applicable non-bankruptcy law); *see also Sherman v. Novak (In re Reilly)*, 245 B.R. 768, 773 (B.A.P. 2d Cir. 2000) (noting that although a properly executed proof of claim is *prima facie* evidence of the claim's validity, the burden of proving the claim can shift back to the claimant where the objecting party presents evidence that, "if believed, would refute at least one of the allegations essential to the claim").  I find that Pu has not met his burden of proving his

31

claim and does not have an enforceable claim against the debtors for those services, and his claim must be disallowed under 11 U.S.C. § 502(b)(1).

(4) Pu seeks $42.50 on account of reviewing a complaint filed by Philip Forster. *See* Defendant's exhibit SS at 992. In his opposition to the Trustee's objection, Pu identifies this complaint as being against a "Gianopoulos Company." *See* Pu's Opposition at 27. The complaint is not identified in any of Pu's submissions, however, Plaintiff's exhibit 102 is a December 22, 2003 motion to dismiss a complaint filed in federal court by Philip Forster against Gus and Tom in their individual capacities on December 1, 2003. Attached to the motion to dismiss is a copy of a complaint dated November 12, 2003 brought by Philip Forster against Gus and Tom in their individual capacities in Connecticut state court. Pu's time entry is dated December 8, 2003 and reads as follows: "Review complaint by Philip Forster." Defendant's exhibit SS at 992. The only fair inference is that Pu was reviewing one of the aforementioned complaints and therefore was not performing services on behalf of the debtors or a Gus Company. Pu does not have an enforceable claim against the debtors for those services, and his claim must be disallowed under 11 U.S.C. § 502(b)(1).

(5) Pu seeks $62.50 on account of corresponding with Tom regarding "complaint in action to enforcement [sic] easement." *See* Defendant's exhibit SS at 1076. No further information regarding this action has been submitted by either side. The burden was on Pu to prove that the services were performed on behalf of the debtors or the Gus Companies since the Trustee objected on the grounds that these services were not performed for the debtors. *See Raleigh*, 530 U.S. at 21; *Sherman*, 245 B.R. at 773. I find that Pu has not met his burden of proving his claim and does not have an enforceable

32

claim against the debtors for those services, and his claim must be disallowed under 11

U.S.C. § 502(b)(1).

### I.      **Prudential Litigation**

Pu seeks $10,778 on account of services performed in litigation against Prudential Insur-

ance Company.   Pu represented the plaintiffs – the Gus Companies, Benni's, LLC, Argonne

Enterprises, LLC, Food Systems, LLC, Gus, Lisa, Mark Forster, Phillip Forster and Christopher

Tsavoussis.  Because Pu represented the Gus Companies, for the reasons articulated previously,

Pu has an enforceable claim against the debtors for those services, and his claim must be

allowed.

### J.      **Questech Litigation CT**

Pu seeks $18,563.10 on account of services performed in representing a company named

Benni's, LLC in litigation against Questech.  *See* Defendant's exhibit II.  None of the entities Pu

represented were debtors herein or Gus Companies nor were any assets involved transferred to

the debtors.  For the reasons articulated previously, Pu does not have an enforceable claim

against the debtors for those services, and his claim must be disallowed under 11 U.S.C. §

502(b)(1).

### K.      **Food Management v. State Farm Insurance**

Pu seeks $3,459.24 on account of services provided in litigation between FMG and State

Farm Insurance.  Pu represented plaintiffs FMG, Food Management Services Corp., Benni's II,

LLC, Bronx Third Donuts, Inc., Armstrong General Contracting, Tom, Gus, and Lisa.  The liti-

gation was an attempt to prevent State Farm from discontinuing insurance policies held by the

plaintiffs.  *See* Defendant's exhibit MM.  The Trustee asserts that some, if not all, of the vehicles

covered by the policies were owned by non-debtors.  *See* Objection at ¶ 63.  Noting that the real

33

beneficiaries of this action were the vehicle owners, the Trustee argues that Pu's services did not provide any real value to the debtors, much less the reasonable value required by 11 U.S.C. § 502(b)(4).  As noted previously, the Trustee misinterprets Section 502(b)(4).  There is no requirement that the services convey any tangible value to the debtor.  What is required is that the amount charged for the services not exceed the reasonable value of those services.  Pu was retained at the rate of $250 per hour by a debtor entity to prevent State Farm from discontinuing insurance policies held by that debtor entity.  While the Trustee may question the propriety of FMG's decision to purchase the insurance policies, I cannot find as a matter of law that Pu's fee for his services in defending those insurance policies exceeds the reasonable value of those services.  Pu has an enforceable claim against the debtors for those services, and his claim must be allowed.

### L. <u>Tallo Litigation</u>

Pu seeks $55,714.72 on account of services provided in litigation with Leonard Tallo.  Pu's testimony characterizing this suit as essentially a dispute over the equity ownership of several Gus Companies would have led the Court to deny Pu's claim for services on the grounds that they could not have possibly provided any benefit to these debtors.  However, upon review of the actual pleadings, it appears that Pu is entitled to a claim for his services.  There were two actions involving Mr. Tallo.  In one, Tallo sued to acquire an ownership interest in some of the donut shops located in the Bronx on the assertion that he had been promised a one-third interest in those shops in return for performing construction work at those shops, now owned by the debtors.  If Tallo were denied an ownership interest in the shops, he might nevertheless have been entitled to a money claim for *quantum meruit*.  *See* Defendant's exhibit NN.  In that action Pu initially represented six Gus Companies, Gus, Tom, Sophie Gianopoulos and Meletios

Gianopoulos, and later represented the debtor KMA entities and the Bronx Donut Bakery when they were added as defendants. In the other, Pu represented Gus, Tom and eight of the Gus Companies as plaintiffs in an action against Tallo seeking to recover, among other things, damages arising from a breach of an agreement to provide construction services. *See* Plaintiff's exhibit 47. In both actions Pu represented Gus Companies and in the action brought by Tallo, Pu represented debtor entities as named defendants. Accordingly, for the reasons articulated previously, Pu has an enforceable claim against the debtors for services in the Tallo litigation, and his claim must be allowed. However, $1,411.53 was billed on account of fees and expenses that were incurred post-petition and cannot be allowed for the reasons articulated previously. Therefore, Pu has an allowed claim on account of the Tallo litigation in the amount of $54,302.69.

### M.  Dunkin' Donuts v. 580 Ninth Avenue Associates

Pu seeks $6,037.61 on account of services provided in a litigation involving 580 Ninth Avenue Associates. Pu represented defendants 580 Ninth Avenue Food Associates, WP Donuts, Inc., Gregory Masone and Gregory Katsoros. None of the entities Pu represented were debtors herein or Gus Companies nor were any assets involved transferred to the debtors. For the reasons articulated previously, Pu does not have an enforceable claim against the debtors for those services, and his claim must be disallowed under 11 U.S.C. § 502(b)(1).

## Conclusion

For the foregoing reasons, Pu's claim is reduced by $404.994.04 and shall be allowed as
an unsecured claim in the amount of $84,454.77.  Counsel for plaintiff is directed to prepare,
circulate to the parties in interest for approval as to form (without waiving any party's right to
appeal) and submit to the Court for signature an appropriate order consistent with this Decision.


Dated:  White Plains, New York
         July 16, 2008

                          **/s/ Adlai S. Hardin, Jr.**
                                    **U.S.B.J.**